**Opinion issued August 30, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00497-CV

———————————

## IN THE INTEREST OF T.C., A CHILD

———————————

**On Appeal from the 309th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-71072**

———————————

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's

order, entered after a bench trial, terminating her parental rights to her minor child,

---

[1]     *See* TEX. FAM. CODE ANN. § 263.405(a) (Vernon 2014); TEX. R. APP. P. 28.4.

T.C.[2]  In four issues, mother contends that the trial court erred in appointing the Department of Family and Protective Services ("DFPS") as T.C.'s permanent managing conservator[3] and the evidence is legally and factually insufficient to support the trial court's findings that that she knowingly placed, or knowingly allowed T.C. to remain, in conditions or surroundings which endangered her physical and emotional well-being;[4] engaged, or knowingly placed T.C. with persons who engaged, in conduct that endangered her physical and emotional well-being;[5] failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of T.C.;[6] and termination of her parental rights was in the best interest of T.C.[7]

We affirm.

---

[2]     At the time of trial, T.C. was three years old.  Mother has two other children, S.C. and T.L.C., who are not the subjects of the instant appeal.  At the time of trial, S.C. was fourteen years old and T.L.C. was six years old.

       The trial court also terminated the parental rights of T.C's alleged father, and mother's former boyfriend, C.W., who is not a party to this appeal.

[3]     *See* TEX. FAM. CODE ANN. § 161.207(a) (Vernon Supp. 2017).

[4]     *See id.* § 161.001(b)(1)(D) (Vernon Supp. 2017).

[5]     *See id.* § 161.001(b)(1)(E).

[6]     *See id.* § 161.001(b)(1)(O).

[7]     *See id.* § 161.001(b)(2).

## Background

On September 10, 2015, DFPS filed its first amended petition, seeking termination of mother's parental rights to T.C. and managing conservatorship of the child. DFPS attached to its petition the affidavit of DFPS Investigator Sefra Perkins.

In the affidavit, of which the trial court took judicial notice at trial, Perkins testified that on March 9, 2014, DFPS received a report of neglectful supervision of T.C. and mother's other two children, S.C. and T.L.C. S.C., who was eleven years old at the time, had found mother "unresponsive on the floor next to her bed." Also, found next to the bathroom sink, was an aspirin bottle with forty-nine pills missing. S.C. called for emergency assistance, and mother was taken to a hospital.

During DFPS's investigation of the incident, mother stated that "she was not trying to commit suicide." However, mother conceded that she had taken "10-15 pills due to feeling really upset." She had been feeling upset "for some time," "got real depressed," and an argument with C.W., T.C.'s alleged father, "triggered her." Because mother was "unable to provide adequate care for" the children, T.C. and her sister, T.L.C., were placed with mother's sister to "ensure [their] safety." On November 11, 2014, mother removed T.C. and T.L.C. from their placement with her sister.[8]

---

[8] Mother stated that her relationship with her mother and sister was very strained.

On December 4, 2014, mother left T.C., who was eleven months old at the time, and T.L.C., who was four years old, home alone at night while she went to a store. When mother returned home, T.L.C. was "at the door." Mother stated that she had "left the children alone to get medication for [T.L.C.] because she had a really bad cough." The next day, however, the DFPS caseworker did not see T.L.C. coughing, and she noticed that the bottle of medicine purportedly bought by mother the night before was "less than half full." Law enforcement officers had to be called to mother's home that day because she would not release T.C. into the custody of DFPS.[9]

Perkins further testified that mother admitted "to leaving [her] 4 year old and 11 month old home alone to go to a . . . store late at night." Mother also instructed T.L.C. not to "tell anyone that she [had] left [the home]" and confided in C.W. that she "need[ed] to figure out how to tell [T.L.C.] how not to tell anyone about what [went] on in [her] home." Perkins opined that by leaving the children home alone, mother "creat[ed] an immediate danger to the[ir] safety and welfare," "demonstrate[d] [her] inability to be protective of [her] children," and "exhibit[ed] questionable judgment through her actions."

---

[9]    T.L.C.'s father picked her up and told the DFPS caseworker that he would keep her. However, he stated that he was afraid that "mother would come with police to his home." While he had possession of his child, mother later "threatened" T.L.C.'s father with "removal" of T.L.C. and "indicated that she [would] be taking the police out with her . . . to enforce her wishes."

4

At trial, DFPS caseworker Tara Biggers testified that she had previously been a supervisor assigned to T.C.'s case. When the case was initiated, mother received a Family Service Plan ("FSP"), which the trial court admitted into evidence. Biggers was present at the time mother received her FSP, which stated that on March 9, 2014, DFPS had received a report of neglectful supervision of mother's children, including T.C. S.C. had found mother unresponsive next to her bed and called for emergency assistance. Also, found next to the bathroom sink, was an aspirin bottle with forty-nine pills missing. Mother was transported to a hospital. Further, on December 5, 2014, DFPS received a telephone call from a person stating that mother had left her children home alone on the previous night "while she went to the grocery store [for] over 20 minutes.

The FSP also stated that mother had continually left her two young children, T.C. and T.L.C., "who [were] both very vulnerable," unsupervised and alone in her home. While T.C. and T.L.C. were home alone, T.L.C. "left the home, and was seen wandering around the apartment complex looking for her mother." Further, mother "ha[d] failed to accept responsibility of being a parent to her children" and "lack[ed] the ability to apply how to be a better parent." She had limited familial support, "ha[d] not demonstrated an ability to use her support systems to help ensure that [her] children [were] safe at all times," and was diagnosed with "[m]ental health issues."

Under her FSP, mother was required to participate in counseling; maintain stable employment for six months and submit her paystubs to her caseworker each month; attend all court hearings, permanency conference meetings, and family visits; submit to random narcotics testing; maintain contact with her children; maintain stable housing and provide her caseworker with a copy of her lease; attend parenting classes, successfully complete those classes, and provide her caseworker with a certificate of completion; and participate in a psychological evaluation and follow all recommendations from that evaluation, including any recommendations for individual therapy and family therapy.[10] Biggers noted that mother did not complete her FSP, including her individual therapy or family therapy requirements.[11]

In regard to mother, Biggers testified that her children were "a big part of her life" and she appeared to love T.C. and her other two children. However, during the pendency of the case, mother was uncooperative, very argumentative, and

---

[10] Biggers similarly testified that under mother's FSP, she was required to participate in individual therapy, complete a psychological evaluation, maintain a stable home, be employed, attend court hearings and parenting classes, and follow any recommendations of her evaluators or therapists.

[11] Biggers explained that generally when a therapist discontinues therapy with a parent, DFPS does not consider such circumstances to constitute a successful completion of the therapy requirement. In most instances, when a therapy requirement has been completed, a therapist will provide DFPS with her notes, stating that the parent's therapy requirement was successfully met, what the parent had achieved, and that "services [were] no longer needed." However, when a therapist recommends further therapy sessions for a parent and the parent does not follow through on the recommendation, then she does not successfully complete the requirements of her FSP.

"always arguing" with Biggers or with the DFPS caseworker. Further, during mother's visits with T.C. at the DFPS office, Biggers had heard her, in the presence of her children, yelling at the DFPS caseworker. And mother appeared anxious and very upset. Biggers also noted that because of safety concerns, security had to be called more than three times while mother was at the DFPS office.

In particular, during one visit, Biggers recalled that mother had T.C. "on her hip" and was "swinging the baby around," not "supporting her [neck] like she should have been," while arguing with a DFPS caseworker. Mother appeared upset and anxious, and security was called out of concern for the safety of mother's children and to protect them. Mother's visit with the children had to be stopped because of her behavior, and she was removed from the DFPS office by security. Biggers opined that it was not in the children's best interest to observe "their mother being removed by a security officer from their visit." And mother had put T.C., who was one year old at the time, in danger "because of the way her behavior was." Biggers also noted that during another visit with the children at the DFPS office, mother "called the police on [DFPS]," was "upset in front of the children," and unable to "redirect."

Biggers explained that when mother had engaged in her "erratic" behavior at the DFPS office, T.C. was present, saw her mother's behavior, became very upset,

and cried.[12]  Biggers personally observed mother's erratic behavior and T.C.'s negative reaction to it on approximately ten or fifteen occasions.  And she noted that it was not in the children's best interest to observe mother acting erratically.

Biggers further testified that during the pendency of the instant case, DFPS requested that mother no longer have direct contact with it because she was very argumentative, harassed DFPS employees, made "obsessive [telephone] calls," did not comply with DFPS's directives, exhibited erratic behavior during her visits with her children at the DFPS office, and "called the police on [DFPS]."  Mother also sent Biggers and a DFPS caseworker threatening emails.  And Biggers expressed concerns about mother's mental health status.

In regard to T.C., Biggers noted that DFPS's goal for the child was an unrelated adoption and DFPS recommended termination of mother's parental rights. After being removed from mother's care, T.C., at one point, was placed with a relative.  However, while T.C. was placed with the relative, mother was not cooperative, T.C. had to be removed from the placement, but not at DFPS's request, and mother had "called the police to [T.C.'s] foster . . . home."  T.C.'s current foster placement, a non-relative placement, is not a long-term placement and DFPS had requested that she be moved to a more permanent placement during the pendency of the instant case.  However, the trial court had denied that request because, at the

---

[12]    S.C. and T.L.C. were also upset by mother's "erratic" behavior at the DFPS office.

8

time, T.C.'s case had been set for trial.  Biggers opined that the potential permanent placement for T.C., which was with her doctor, was still an available long-term placement for the child at the time of trial.

In regard to C.W., T.C.'s alleged father, Biggers testified that DFPS was aware that he was a registered sex offender[13] and DFPS had discussed that fact with mother prior to September 2016.  During the discussion, mother told DFPS that she did not have a relationship with C.W.  Biggers expressed concern about C.W. being around mother's children because "he's a registered sex offender who's highly likely to offend again."

Cathy Jordan, a counselor at Clear Channel Counseling, testified that she began seeing mother for individual therapy in February 2015.  During their sessions, Jordan worked with mother on issues related to anxiety, depression, anger management, "setting boundaries," and parenting. Mother attended therapy sessions with Jordan once every two weeks until June 2016, when she began attending sessions once a week.  Generally, mother was cooperative, but not forthcoming,

---

[13]    The trial court admitted into evidence C.W.'s criminal record, revealing that on December 1, 2005, he was convicted of the felony offense of sexual performance by a child and sentenced to confinement for three years.  *See* TEX. PENAL CODE ANN. § 43.25(d), (e) (Vernon Supp. 2017).  In that case, the indictment alleged that C.W., "did then and there unlawfully, and knowing the character and content of the material, intentionally and knowingly direct[] a performance including sexual conduct by a child younger than eighteen years of age, namely photographing the child[']s female sexual organ area." *See id.* § 43.25(d).

9

during her sessions with Jordan. Jordan opined that mother wanted T.C. and her other two children returned to her care.

In September 2016, Jordan began seeing mother, T.C., and mother's other two children for family therapy sessions.[14] On September 26, 2016, she attended a family therapy session at mother's home. During the session, mother was cooperative, and Jordan worked with her on "a discipline chart, behavior modification, [and] how to deal with disciplining" her children. She also continued to work with mother on her issues related to anxiety, depression, anger management, parenting, and boundaries. According to Jordan, mother, T.C., and the other two children appeared to interact as a family, the children appeared to love their mother, and the children knew that mother was in fact their mother. In regard to mother's home, Jordan stated that it had enough space for T.C. and mother's other two children, S.C. had her own bedroom, and T.C. shared a bedroom with T.L.C. Mother's "home [was] furnished for [the] children" and safe.

Jordan explained that although she had originally recommended family reunification for mother and T.C., her recommendation changed after the September 26, 2016 family therapy session because, at that time, she learned that mother had taken T.C. and her other two children "on an outing with a [registered] sex offender,"

---

[14]    Jordan noted that she had only two family therapy sessions with mother and her children.

i.e., T.C.'s alleged father., C.W., during the children's unsupervised visit with mother. When Jordan told mother that such behavior was unacceptable and "she needed to immediately stop seeing" C.W., mother appeared remorseful and "promised to never do it again." However, Jordan noted that she and mother had, prior to September 2016, during an individual therapy session, discussed C.W. And she had previously advised mother not to have any relationship with him. Further, during that session, mother actually told Jordan that she would not have the children around C.W. In September 2016, however, Jordan learned that mother had done otherwise. Jordan opined that mother's decision to bring T.C. and her other two children around C.W. placed them in danger, mother was not thinking clearly, and she exercised poor judgment by allowing "her children to be around . . . a sex offender."

Jordan further testified that on September 26, 2016, she had her last therapy session with mother, who appeared attentive, angry, sad, guarded, fidgety, and anxious. At that time, mother exhibited poor judgment and showed signs of anxiety. But, she did not show any signs of depression or suicidal tendencies. When Jordan terminated her therapy sessions with mother, she recommended that mother continue both individual and family therapy. However, she noted that any future family therapy sessions with mother and her children should occur at the DFPS office because of mother's decision to take the children around C.W. while they were

11

attending an unsupervised visit with mother. Jordan also stated that, after September 26, 2016, she no longer recommended family reunification for mother and T.C. And she explained that she terminated her individual and family therapy sessions with mother because she felt that mother "had not been forthcoming with [her] as her therapist," mother "did not trust the process," and mother "did not trust [Jordan] . . . [enough] to be honest and open in [her] communication[s] with" Jordan. Jordan noted that she would be concerned if mother had not engaged in individual or family therapy since September 26, 2016, when her treatment with mother had ended.

In regard to the children, Jordan testified that mother's oldest child, S.C., who was raised by mother, loved mother and was intelligent, personable, and likable. Mother was involved "with the education of her children,"[15] and T.C. and T.L.C. were bonded with mother. Jordan opined that mother's children needed a safe and stable environment.

In regard to mother, Jordan noted that she had a job, and Jordan was not concerned about any illegal narcotics use. However, mother's decision to allow her children to have contact with a registered sex offender weighed against her parental

---

[15] Jordan noted that she was not aware that T.L.C. had been living with her father since she had begun attending pre-kindergarten and father had been T.L.C.'s caregiver since she had become school age.

abilities, especially because mother was aware at the time that she was not allowed to have the children around C.W.

The trial court admitted into evidence Jordan's therapy notes from her individual and family therapy sessions with mother. In her final "Progress Note," dated September 29, 2016, Jordan stated:

Anxiety symptoms are present. [Mother]'s anxiety symptoms continue. The symptoms of this disorder continue unchanged. Anxiety attacks are reported to be occurring a few times a week. [Mother] continues to avoid certain situations because they still evoke anxiety. The frequency of irritability episodes remains the same.

[Mother] exhibits symptoms of borderline personality disorder, characterized by pervasive instability in moods, behavior, and interpersonal relationships. She reports [that] her interpersonal relationships are unstable and intense.

[Mother] exhibits symptoms of dependent personality disorder, characterized by a long standing need to be taken care of and a fear of being abandoned or separated from important individuals in her life. She avoids making decisions and allows others to make her important decisions. [Mother] fears losing [her] family. [She] describes [an] intense fear of abandonment and a sense of devastation or helplessness when relationships end.

In regard to mother's behavior, Jordan, in her "Progress Note," stated that mother's "relationships with family and friends [were] reduced"; "[t]here ha[d] been some outbursts or expressions of anger"; "[t]here ha[d] been fewer instances of impulsive behavior"; mother was sometimes confused; and mother did not have continuous or "completely restful" sleep. Further, during mother's last therapy session, she had appeared angry, sad, guarded, minimally communicative, anxious,

13

and downcast. However, mother was also attentive, appropriately groomed, and cooperative, with no gross behavioral abnormalities. There were "no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process." Mother's associations were intact, her thinking was logical, and she expressed no suicidal ideas or intentions. Jordan noted that mother's insight into her problems and her judgment appeared poor, and she was fidgety. Jordan diagnosed mother with a generalized anxiety disorder and made the following recommendations: "Continue treatment . . . . Individual [c]ounseling and [f]amily counseling but due to change in [mother's] behavior . . . . family [therapy] sessions [should] return to the confines of the [DFPS] office . . . ."

In her "Group Therapy Note," also dated September 29, 2016, Jordan explained that the focus of the family therapy session on September 26, 2016 was "the exploration and understanding of family dynamics" and mother, T.C., and mother's other two children were present. During the session, mother and the children "appeared guarded, minimally communicative, and happy." Mother "[d]isplayed [a] sad demeanor," was fidgety, and exhibited restless behavior. Her posture and body language also suggested underlying anxiety, but she did not express any suicidal ideas or intentions. Jordan again diagnosed mother with a generalized anxiety disorder and recommended that she continue family therapy sessions at the DFPS office "under [the] direct supervision [of] the staff" until

14

mother was capable of making better decisions in regard to the welfare of her children.[16]

T.L.C.'s father testified that he was currently the primary caretaker of the child and she had been living with him for two years and six months, i.e., "throughout the pendency of th[e] . . . case."[17] In regard to his interactions with mother, T.L.C.'s father noted that, during the pendency of the instant case, she had cursed at him, she had obsessively sent him text messages,[18] and the trial court had ordered her not to contact him directly. In her text messages, she "w[ould] become very angry[,] . . . use a lot of swearing and profanity[,] and [make] derogatory statements toward[] [T.L.C.'s father] and [his] family." In the past, mother had been abusive, verbally abusive, and negative toward him. And she had made derogatory remarks toward T.L.C.'s father in front of their child, including telling T.L.C. that

---

[16]     In her first "Progress Note," dated February 23, 2015, Jordan diagnosed mother with a generalized anxiety disorder and a "[l]ack of insight into the consequences of [her] behavior." She stated that mother "expressed feelings of defensiveness, blame, anxiety, fear and frustration about losing her children in the system" and reported "that it was her fault that her children [were] in the system and she should have been more thoughtful and used better judgment when making a decision that would affect her life."

[17]     T.L.C.'s father noted that, while T.L.C. was in his care, mother had inappropriate telephone conversations with the child, which upset her. For instance, mother discussed with T.L.C., such things as, "who's supposed to be taking care of her" and mother would "fuss at her for things that . . . w[ere] out of [T.L.C.'s] control," such as what she wore or ate.

[18]     T.L.C.'s father explained that sometimes mother would send him "[h]undreds" of text messages in an hour.

15

her father "ha[d] a family," he was "not taking care of her properly," and T.L.C. was "not supposed to be" with him.

T.L.C.'s father further explained that he was requesting that the trial court order supervised visitation for mother and T.L.C. because, in his opinion, "she ha[d]n't proven that she's responsible in caring for [her] children."[19]  In regard to the night in December 2014, when mother left T.C. and T.L.C. home alone, T.L.C.'s father explained that he had no knowledge as to whether or not mother actually went to a store to get medication for T.L.C.  However, he noted that T.L.C. was not sick and did not show any signs of sickness when he picked her up the next day.

T.L.C.'s father also expressed concern that his child had had contact with C.W. while in mother's care because having a child around a registered sex offender is "very dangerous."  And he noted that he was concerned with mother's judgment and felt that DFPS needed to monitor mother's interactions with T.L.C.  He opined that mother was not capable of co-parenting with him, and he wanted T.L.C. to remain in his care because he "c[ould] make better decisions" regarding her well-being and mother was "dangerous to [his] child."

---

[19]    The trial court admitted into evidence a letter, written in 2013, several years before trial, from mother to T.L.C.'s father in which she stated that she wanted him to "[s]ign over [his] parental rights" to T.L.C. because C.W. was involved in T.L.C.'s life, C.W. loved and adored mother's children, and T.L.C. "call[ed] [C.W.] daddy." Mother stated that C.W. wanted to adopt T.L.C.

16

Terry Lender, a senior investigator for the Harris County Attorney's Office, testified that he performed a "criminal check" on mother and, at the time of trial, she "ha[d] an outstanding misdemeanor C warrant out of Pearland P[olice] D[epartment] for failure to maintain financial responsibility . . . from 9-24-2014."[20] Lender noted that the warrant was active and related to mother "not having insurance to drive."

Mother testified that she had three children, S.C., born in 2002, T.L.C., born in 2010, and T.C., born in 2013, that were removed from her care in December 2014. C.W., a registered sex offender, is T.C.'s father. Mother began dating C.W. in 2012, and she became aware that he was a registered sex offender in July 2013, while she was pregnant with T.C. She noted that although she had previously been in a relationship with C.W., it had ended in 2015. C.W. had been to mother's home and had previously spent the night there, although it had been "[a] long time" since that had occurred. She last saw C.W. on September 24, 2016; however, while the instant case was pending, she had contact with C.W. through text messages and the telephone.[21] Mother noted that she had emailed C.W. in January 2017, a month

---

[20] *See* TEX. TRANSP. CODE ANN. § 601.051 (Vernon 2011) (requirement of financial responsibility), § 601.191(a) (Vernon Supp. 2017) ("A person commits an offense if the person operates a motor vehicle in violation of [s]ection 601.051.").

[21] Mother explained that she had seen C.W. "[a]t the most, five [times]" since September 24, 2016, either at the library or on her way to the bus. However, she did not discuss anything with C.W. during those times. And she had not had direct contact with C.W. since September 24, 2016, although she had "seen him from time to time sometimes, not all the time."

before trial began. According to mother, her relationship with C.W. was abusive, but she did not want C.W.'s parental rights terminated.

Mother further testified that on September 24, 2016, she told C.W. that she and the children, including T.C., were going to a Chuck E. Cheese restaurant during one of her unsupervised visits with the children.[22] He then came to the restaurant, although she did not invite him. C.W. was at the restaurant for thirty minutes, and during that time, he held T.C. and hugged her once. C.W. also came to mother's home that day, while the children were there for their unsupervised visit. Mother let C.W. into her home and did not "force him to leave." He stayed at mother's home for about thirty minutes, and during that time, he tickled T.L.C. and chased the children around in a circle "for play." Mother conceded that she had exercised poor judgment in allowing C.W. to have contact with the children, and she stated that she would not let him near the children again because it was not in their best interest.

Mother noted that she is employed by Envoy Air and her income is $1,052 per month. She works five days a week from 10:00 p.m. to 3:00 a.m., but she could change her work schedule to work from 9:00 a.m. to 2:00 p.m. if T.C. was returned to her care. She also explained that if T.C. was returned to her care, mother's friend, who owns a daycare facility, would watch T.C. while mother worked, and either that

---

[22] Mother stated that she had had five unsupervised visits with the children during the pendency of this case. On September 24, 2016, she had her last unsupervised with them.

18

friend would drive T.C. to mother when she was done working or mother would "take [an] Uber"[23] to pick the child up.[24] Moreover, although mother has health insurance through her employer, she acknowledged that "[i]t would be really expensive" to have her children covered by health insurance.

Mother explained that although she does not own a car, she has stable housing,[25] paying $340 a month in rent pursuant to a discount through a public housing program. However, in January 2017, the last time that she had renewed her paperwork for the housing program, she disclose that her children had not been living with her.[26] Mother also, based on her income and "how many children live[d] in [her] home," received approximately $150 in governmental assistance in the form of an "EBT food stamp card." Previously, in December 2016, she reported that her EBT food stamp card, which she had not used since September 24, 2016, the date

---

[23] "Uber provides a service whereby individuals in need of vehicular transportation can log in to the Uber software application on their [cellular telephone], request a ride, be paired via the Uber application with an available driver, be picked up by the available driver, and ultimately be driven to their final destination." *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1135 (N.D. Cal. 2015); *see also* UBER, https://www.uber.com/ (last visited August 30, 2018).

[24] Mother did not know the potential cost of daycare.

[25] Mother's home, which is neat and clean, has a gate to block the stairs and safety plugs for the electrical outlets. She had previously told the children that while there, they should not open the front door.

[26] Mother also did not disclose to the public housing program that her children were not living with her when she renewed her paperwork in 2015 or 2016. When asked whether "[s]tating that [her] . . . children [were] living in [her] home since 2014" was "false information," mother replied, "Yes, that would be false."

19

that C.W. was last at her home, had been stolen by C.W. And, at the time of trial, mother was not receiving "food stamps" because "[i]t's just [her]" living in her home and she did not need them. Mother opined that, although she did not have familial support, she could financially afford to care for her children, having bought them clothes and paid "[a] little bit" for their medications while they were in DFPS's custody. However, she conceded that she had not financially supported T.L.C. while she had been in the care of her father.

Mother acknowledged that there was an active warrant for her arrest related to "an old traffic ticket" and she did not have $900 "to pay to get that warrant removed."[27] Further, she admitted that she suffered from anxiety, but denied using narcotics.

In regard to the instant case, mother testified that DFPS had become involved with the children and her in March 2014, after she had taken three or four aspirin pills while her children were in her home. According to mother, she called for emergency assistance that day and was taken to a hospital.[28] She was "really sad because [her] grandmother had died," she had been "having a lot of bad headaches from" giving birth to T.C., and she had "split [her] stitches." She was in pain, was

---

[27]  *See* TEX. TRANSP. CODE ANN. § 601.051 (requirement of financial responsibility), § 601.191(a) ("A person commits an offense if the person operates a motor vehicle in violation of [s]ection 601.051.").

[28]  Mother also testified that her mother, not she, had called for emergency assistance.

on "bedrest," and felt overwhelmed and depressed. And she did not have any help. Mother explained that she had not "tr[ied] to kill" herself, but at the hospital, she did go "to see somebody" in psychiatric services because she had taken the pills. She also did go to the Mental Health and Mental Retardation Authority ("MHMRA") of Harris County after the "pill incident."

After DFPS became involved with mother and her children, it placed T.C. and T.L.C. with mother's sister through "a family base safety plan,"[29] and mother continued to see the children at her sister's home. Mother noted that her caseworker had told her that she "could break the placement at any time." And in December 2014, she took T.C. and T.L.C. back to her home, even though they "were . . . still in that parental-child-safety" plan. While T.C. and T.L.C. were with mother, she left T.L.C., who, at the time, was four years old, and T.C., who was eleven months old, unattended in her apartment at night to go to a store to get medicine for T.L.C., who was sick. One or two days before, she had taken T.C. and T.L.C. to see the doctor, but she could not get medicine for T.L.C. at that time because she "didn't have the money." Mother explained that it had taken her two days to get enough money to purchase medicine for T.L.C., and she conceded that it was not a good decision to leave T.C. and T.L.C. at home by themselves.

---

[29] DFPS placed S.C. with her grandmother.

Mother further testified that she had received a FSP, which required her to participate in parenting classes, see a family therapist, attend individual counseling and anger management sessions, and "see a psychologist, MHMRA." Although she did not receive a "formal letter of release from [the] MHMRA," she was told in September 2016 over the telephone that she "no longer had to go to [the] MHMRA." Mother also saw a psychologist in 2015, completed parenting classes,[30] participated in family therapy sessions, completed a psycho-social assessment, provided DFPS with "check stubs" and a copy of her lease, attended all court hearings and permanency hearings, was compliant with any random narcotics testing, and maintained contact with her children.

Mother also explained that her family therapist was Jordan, but her sessions with Jordan had stopped after mother had allowed C.W. to have contact with her children in September 2016. After Jordan, mother saw another therapist, Terence Scott, for approximately five individual therapy sessions. However, the last time that she had attended a therapy session with Scott was about four months prior to trial because she could no longer afford to pay him. Mother conceded that she did not receive a "successful completion of therapy certificate from . . . Scott," and she did not see another family therapist after Jordan had terminated her family therapy

---

[30]   The trial court admitted into evidence a "Certificate of Attendance" related to her completion of parenting classes.

sessions with mother. Further, although she had worked with Jordan on anger management issues, she did not seek another therapist to address any anger management concerns, after her therapy sessions with Jordan had terminated. Mother opined that she had completed her individual therapy requirement with Jordan, but she had not completed her family therapy requirement. And she acknowledged that, at one point during the instant case, she was asked to cease contacting DFPS directly.

In regard to her children, mother testified that to discipline them, she would put them in a "timeout in the corner" or spank them, and she had never left any marks or bruises on them. When her children were in her care, she took them to the museum, the park, and on walks outside. Mother also took them to the doctor, and they were current with their immunizations. Moreover, during their visits with mother, the children were happy to see her.

In regard to T.C., mother explained that she was requesting that she be named her sole managing conservator, C.W. have no contact with T.C., and C.W. be ordered to pay child support. She was willing and able to care for T.C., but she did not want C.W.'s parental rights to be terminated because then "he wouldn't be able to pay child support." Mother opined that T.C. wanted to live with her and it was not in T.C.'s best interest for mother's parental rights to be terminated. Mother also noted that T.C. had a speech delay and she would find a speech therapist for T.C. She

further planned to read to T.C., "get a line of activities to help her say whole sentences," and allow T.C. to start school. However, according to mother, when T.C. had previously lived with her, the child did not "have a regular schedule." In regard to T.C.'s placement while in DFPS's care, mother noted that T.C. had previously been placed with her cousin, but the cousin had returned T.C. to DFPS's custody because mother "told her . . . [that she] didn't want her with [T.C.]" And mother admitted to calling law enforcement officers to T.C.'s foster placement.

In regard to her interactions with T.L.C.'s father, mother testified that she had previously gone to his home without permission and law enforcement officers had been called. Further, when she and T.L.C.'s father had lived together in the past, they "fought," mother "argued back," and T.L.C.'s father "hit [her] in front of [S.C.]" while she was pregnant.[31] Although mother called for emergency assistance, T.L.C.'s father was not arrested. She also expressed that she had difficulty, at the time of trial, in getting along with T.L.C.'s father, described her relationship with him as "sour," and noted that she had been asked to stop communicating with him directly during the pendency of the instant case.

Cheryl Cohorn, mother's guardian ad litem, testified that during the pendency of the instant case, she observed mother with her children, including T.C., approximately fifteen to twenty times. Mother appeared to have a good and normal

---

[31]    T.L.C.'s father denied being abusive toward mother during his relationship with her.

24

relationship with the children and appropriately played with T.C. and T.L.C. She always brought something for the children to play with at their visits, such as "marbles or coloring [tools] or dolls," and the children responded to mother "as if she was their mother." And Cohorn did not observe anything during mother's visits with the children that caused her any concern. At the time of trial, mother was still having visits with her children, and as far as Cohorn was aware, mother had always arrived timely for those visits.

In regard to mother, Cohorn noted that she had anxiety issues, she had previously reported having taken an overdose of pills to mental health professionals, and that overdose was the reason that DFPS had become involved in the case. During the pendency of the instant case, mother had "episodes" during which she would frequently call Cohorn, particularly when she was anxious about something. Cohorn also noted that mother "needed somebody to follow up with what she's supposed to be doing." And at one point during the pendency of the case, mother was ordered not to contact DFPS.

Cohorn further testified that mother lived in an apartment, where she had been living for five years and where the children had previously lived. Cohorn described the apartment as spacious and noted that the "children ha[d] their own spaces in their own rooms," a closet, and clothes. There was also a gate at the top of the stairs for T.C., and "[t]he living area was appropriate." Mother displayed pictures of the

children in the home and their artwork. Cohorn noted that mother rode the bus, and she opined that mother would be able to "get her children around where they needed to be" if they were returned to her care.

In regard to C.W., Cohorn testified that mother had had contact with him, a registered sex offender, the children had had contact with him, and mother's decision to allow him around the children was a "terrible" one. Cohorn expressed concern about mother's decision to allow C.W. to have contact with the children, especially considering that the instant case was initiated in December 2014 and she still, in September 2016, had allowed C.W. to see the children. Cohorn opined that mother should not see C.W. again, he should not have contact with the children, and there should be a "no-contact order regarding [C.W.]" When asked if she "ever ha[d] concerns about [mother]'s continued relationship with [C.W.] after" she had allowed him to have contact with the children in September 2016, Cohorn responded, "Yes." Further, although mother had been allowed to have visits with the children at her home, those visits had stopped after mother had allowed C.W. to have contact with her children.

**Standard of Review**

A parent's right to "the companionship, care, custody, and management" of her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982) (internal

quotations omitted). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a parental-rights-termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore

28

the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

## Sufficiency of the Evidence

In her first, second, and third issues, mother argues that the trial court erred in terminating her parental rights to T.C. because the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed T.C. to remain, in conditions or surroundings which endangered her physical and emotional well-being; she engaged, or knowingly placed T.C. with persons who engaged, in conduct that endangered her physical and emotional well-being; she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of T.C.; and termination of her parental rights was in the best interest of T.C. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (b)(2) (Vernon Supp. 2017).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under Texas Family Code section 161.001(b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

***Endangering Conduct***

In a portion of her first issue, mother argues that the evidence is legally and factually insufficient to support the trial court's termination of her parental rights to T.C. under section 161.001(b)(1)(E) because "[t]he evidence that mother engaged in a voluntary, deliberate, and conscious course of conduct that en[dangered] [T.C.]'s physical and emotional well[-]being" consisted only of "(1) the 'Pill Incident' in March 2014; (2) the 'Medicine Incident' in December 2014; and[] (3) the 'C.W. Incident' in September 2016" and "these three incidents d[id] not show a continuing course of endangering conduct that support[ed] the subsection (E) finding."

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Within the context of subsection E, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. Instead, "endanger" means to expose a child to loss or injury or to jeopardize her emotional or physical health. *Id.* (internal quotations omitted); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (internal quotations omitted).

It is not necessary to establish that a parent intended to endanger the child in order to support termination of the parent-child relationship. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (neglect, even in absence of physical abuse, may endanger child's physical or emotional well-being). However, termination under subsection E requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). The specific danger to the child's well-being may be inferred from parental misconduct standing alone, even if the

31

conduct is not directed at the child and she suffers no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). And courts may consider parental conduct that did not occur in the child's presence, including conduct before the child's birth and after she was removed by DFPS. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Walker*, 312 S.W.3d at 617.

DFPS became involved in the instant case when it received a report of neglectful supervision of T.C. and mother's other two children, S.C. and T.L.C. S.C., who was eleven years old at the time, had found mother "unresponsive on the floor next to her bed." Also, found next to the bathroom sink, was an aspirin bottle with forty-nine pills missing. S.C. called for emergency assistance, and mother was taken to a hospital. During DFPS's investigation, mother reported that "she was not trying to commit suicide"; however, she had taken "10-15 pills due to feeling upset." She had been feeling upset "for some time," "got real depressed," and an argument with C.W. "triggered her." Mother's FSP noted that she had been diagnosed with

"[m]ental health issues,"[32] and DFPS caseworker Biggers expressed concerns about mother's mental health status.[33]

In her final "Progress Note," dated September 29, 2016, Jordan, mother's therapist, addressed mother's mental health status, stating:

> Anxiety symptoms are present. [Mother]'s anxiety symptoms continue. The symptoms of this disorder continue unchanged. Anxiety attacks are reported to be occurring a few times a week. [Mother] continues to avoid certain situations because they still evoke anxiety. The frequency of irritability episodes remains the same.
>
> [Mother] exhibits symptoms of borderline personality disorder, characterized by pervasive instability in moods, behavior, and interpersonal relationships. She reports [that] her interpersonal relationships are unstable and intense.
>
> [Mother] exhibits symptoms of dependent personality disorder, characterized by a long standing need to be taken care of and a fear of being abandoned or separated from important individuals in her life. She avoids making decisions and allows others to make her important decisions. [Mother] fears losing [her] family. [She] describes [an] intense fear of abandonment and a sense of devastation or helplessness when relationships end.

And although mother did not express any suicidal ideas or intentions during her final session in with Jordan, she appeared angry, sad, guarded, minimally communicative,

---

[32] Mother's FSP also stated that DFPS had received a report of neglectful supervision of mother's children. S.C. had found mother unresponsive next to her bed and called for emergency assistance. Also, found next to the bathroom sink, was an aspirin bottle with forty-nine pills missing. Mother was transported to a hospital.

[33] Cohorn, mother's guardian ad litem, testified that mother had previously reported an overdose to mental health professionals and her overdose was the reason that DFPS became involved in the instant case.

anxious, and downcast. Jordan opined that mother's insight into her problems and her judgment were poor, and she diagnosed mother with a generalized anxiety disorder and a "[l]ack of insight into the consequences of [her] behavior." Jordan recommended that mother continue individual and family therapy after her therapy sessions with Jordan ceased. Mother did not follow through with Jordan's recommendation.

Mother testified that DFPS had become involved with the children and her in March 2014, after she had taken three or four aspirin pills while her children were in her home. According to mother, she called for emergency assistance that day and was taken to a hospital.[34] She was "really sad because [her] grandmother had died," she had been "having a lot of bad headaches from" giving birth to T.C., and she had "split [her] stitches." She was in pain, was on "bedrest," and felt overwhelmed and depressed. And she did not have any help. Mother explained that she had not "tr[ied] to kill" herself, but at the hospital, she did go "to see somebody" in psychiatric services because she had taken the pills. She also did go to the MHMRA of Harris County after the "pill incident."

A parent's mental instability and attempt to commit suicide may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *See In re T.G.R.-M.*, 404 S.W.3d 7, 14, 16 (Tex.

---

[34] Mother also testified that her mother, not she, had called for emergency assistance.

App.—Houston [1st Dist.] 2013, no pet.); *Jordan v. Dossey*, 325 S.W.3d 700, 723–26 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *In re J.T.G.*, 121 S.W.3d 117, 126–27 (Tex. App.—Fort Worth 2003, no pet.); *see also In re C.D.*, 664 S.W.2d 851, 852–54 (Tex. App—Fort Worth 1984, no writ) ("[W]hen a parent's mental state allows h[er] to engage in conduct which endangers the physical and emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights."). This is because conduct that subjects a child to a life of uncertainty and instability also endangers the child's physical and emotional well-being. *See In re T.G.R.-M.*, 404 S.W.3d at 14; *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

We note that although mother denied that she had attempted to commit suicide in March 2014 when she took the aspirin pills, no matter whether an overdose of medication was intentional, as a means of committing suicide, or accidental, such an action can endanger a child's physical or emotional well-being, especially when it occurs while the child is in the home with the parent.[35] *See In re R.M.V.*, No.

---

[35] To the extent that there are discrepancies in the record as to how many aspirin pills mother actually took, whether S.C. called for emergency assistance, and whether mother was found unresponsive in the home by her children, the trial court, as the fact finder, is the sole judge "of the credibility of the witnesses and the weight to give their testimony." *See Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (we may not weigh witness's credibility because it depends on appearance and demeanor which are within domain of trier of fact). And the trial court may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). It is also free to believe or disbelieve the

10-11-00298-CV, 2012 WL 4761580, at *12–13 (Tex. App.—Waco Oct. 4, 2012, pet. denied) (mem. op.); *In re E.A.W.S.*, No. 02-06-00031-CV, 2006 WL 3525367, at *11, *13 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (overdosing, even unintentionally, endangered child); *see also In re L.L.W.*, No. 04-15-00221-CV, 2015 WL 4638263, at *4–5 (Tex. App.—San Antonio July 15, 2015, pet. denied) (mem. op.) (sufficient evidence to support termination where mother overdosed with children in home and "several prescription bottles were found strewn about the house"); *In re K.P.*, No. 09-13-00404-CV, 2014 WL 4105067, at *9, *13–15 (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.) (sufficient evidence to support endangerment finding where mother testified she overdosed on Benadryl pills while children home and asleep); *In re M.E.-M.N.*, 342 S.W.3d 254, 262–64 (Tex. App.—Fort Worth 2011, pet. denied) (sufficient evidence to support endangerment finding where mother overdosed on mixture of antibiotics and methadone).

Additionally, DFPS received a report that on December 4, 2014, mother left T.C., who was eleven months old at the time, and T.L.C., who was four years old, home alone at night while she went to a store. When mother returned home, T.L.C. was "at the door." *See Jordan*, 325 S.W.3d at 724 (evidence about parent's other

---

testimony of any witness, and it may accept or reject all or part of a witness's testimony. *In re C.E.S.*, 400 S.W.3d 187, 195 (Tex. App.—El Paso 2013, no pet.).

child relevant). Mother told DFPS that she had "left the children alone to get medication for [T.L.C.] because she had a really bad cough." The next day, however, the DFPS caseworker did not see T.L.C. coughing, and she noticed that the bottle of medicine purportedly bought by mother the night before was "less than half full." Law enforcement officers had to be called to mother's home that day because she would not release T.C. into the custody of DFPS.

Further, DFPS investigator Perkins testified that mother admitted "to leaving [her] 4 year old and 11 month old home alone to go to a . . . store late at night." And Perkins opined that by leaving the children home alone, mother "creat[ed] an immediate danger to the[ir] safety and welfare," "demonstrate[d] [her] inability to be protective of [her] children," and "exhibit[ed] questionable judgment through her actions."[36]

Mother testified that following the "pill incident," DFPS placed T.C. and T.L.C. with mother's sister through "a family base safety plan," and mother continued to see the children at her sister's home. Mother noted that her caseworker

---

[36]    Mother's FSP stated that she had *continually* left her two young children, T.C. and T.L.C., "who [were] both very vulnerable," unsupervised and alone in her home. While the children were alone, T.L.C. "left the home, and was seen wandering around the apartment complex looking for her mother." Further, mother "ha[d] failed to accept responsibility of being a parent to her children" and "lack[ed] the ability to apply how to be a better parent." Mother had limited familial support and "ha[d] not demonstrated an ability to use her support systems to help ensure that [her] children [were] safe at all times." *See Jordan*, 325 S.W.3d at 724 (evidence about parent's other child relevant).

37

had told her that she "could break the placement at any time." And in December 2014, she took T.C. and T.L.C. back to her home, even though they "were . . . still in that parental-child-safety" plan. While T.C. and T.L.C. were with mother, she left T.C., who, at the time, was eleven months old, and T.L.C., who was four years old unattended in her apartment at night to go to a store to get medicine for T.L.C., who was sick. One or two days before, she had taken T.C. and T.L.C. to see the doctor, but she could not get medicine for T.L.C. at that time because she "didn't have the money." Mother explained that it had taken her two days to get enough money to purchase medicine for T.L.C. *See id.* (evidence about parent's other child relevant). She conceded that it was not a good decision to leave T.C. and T.L.C. home by themselves.

Parental neglect can be as dangerous to the well-being of a child as direct physical abuse. *See In re M.C.*, 917 S.W.2d at 270; *In re M.D.V.*, No. 14-04-00463-CV, 2005 WL 2787006, at *6 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem. op.). And a parent's failure to protect or supervise her young child endangers the child's physical or emotional well-being. *See In re M.C.*, 917 S.W.2d at 269–70; *In re A.D.M.*, No. 01-16-00550-CV, 2016 WL 7368075, at *8 (Tex. App.—Houston [1st Dist.] Dec. 20, 2016, pet. denied) (mem. op.) (parent endangered one-year-old child by leaving her home alone); *A.R. v. Tex. Dep't of Family & Protective Servs.*, No. 03-16-00143-CV, 2016 WL 5874874, at *3–5 (Tex.

App.—Austin Oct. 4, 2016, no pet.) (mem. op.) ("Leaving a[] [child] alone can constitute endangerment . . . ."); *In re M.D.V.*, 2005 WL 2787006, at *5–6.

Evidence in the record also shows that T.C.'s alleged father, C.W., is a registered sex offender.[37] Mother began dating C.W. in 2012, and she became aware that he was a registered sex offender in July 2013, while she was pregnant with T.C. She noted that although she had previously been in a relationship with C.W., it had ended in 2015. C.W. had been to mother's home and had previously spent the night there, although it had been "[a] long time" since that had occurred.

Moreover, on September 24, 2016, while this case was pending, mother told C.W. that she and the children, including T.C., were going to a Chuck E. Cheese restaurant during one of mother's unsupervised visits with the children. Although she did not invite him, C.W. came to the restaurant for thirty minutes, and during that time, he held T.C. and hugged her once. C.W. also came to mother's home that day, while the children were there for their unsupervised visit. Mother let him into her home and did not "force him to leave." He stayed at mother's home for about

---

[37] The trial court admitted into evidence C.W.'s criminal record, revealing that on December 1, 2005, he was convicted of the felony offense of sexual performance by a child and sentenced to confinement for three years. *See* TEX. PENAL CODE ANN. § 43.25(d), (e). In that case, the indictment alleged that C.W., "did then and there unlawfully, and knowing the character and content of the material, intentionally and knowingly direct[] a performance including sexual conduct by a child younger than eighteen years of age, namely photographing the child[']s female sexual organ area." *See id.* § 43.25(d).

thirty minutes, and during that time, he tickled T.L.C. and chased the children around in a circle "for play." Mother conceded that she had exercised poor judgment in allowing C.W. to have contact with the children and it was not in their best interest.

Mother further noted that while T.C. was in DFPS's care, she had contact with C.W. through text messages and the telephone. And she had emailed him in January 2017, a month before trial began. Mother also explained that she had seen C.W. "[a]t the most, five [times]" since September 24, 2016, either at the library or on her way to the bus. However, she did not discuss anything with C.W. during those times. And she had not had direct contact with C.W. since September 24, 2016, although she had "seen him from time to time sometimes, not all the time." Further, in 2013, mother wrote T.L.C.'s father a letter, demanding that he "sign over [his] parental rights" to T.L.C. because C.W. was involved in T.L.C.'s life, loved and adored mother's children, and T.L.C. "call[ed] [C.W.] daddy." And mother stated that C.W. wanted to adopt T.L.C. *See Jordan*, 325 S.W.3d at 724 (evidence about parent's other child relevant). Mother noted that she did not want C.W.'s parental rights to T.C. to be terminated.

Almost every witness at trial expressed concern about mother's involvement with C.W. because "he's a registered sex offender who's highly likely to offend again." Biggers testified that, prior to September 2016, DFPS had discussed with mother the fact that C.W. was a registered sex offender, and at that time, mother told

40

DFPS that she did not have a relationship with C.W. Jordan similarly testified that, during an individual therapy session, she had discussed C.W. with mother and advised her not to have any relationship with him. Jordan opined that mother's decision to bring T.C. and her other two children into contact with C.W. placed them in danger and mother exercised poor judgment by allowing "her children to be around . . . . a sex offender." After she had learned that mother had brought T.C. and her other children into contact with C.W., Jordan no longer recommended family reunification for mother and T.C. She further recommended that mother continue family therapy sessions at the DFPS office "under [the] direct supervision [of] the staff" until she was capable of making better decisions in regard to the welfare of her children.

According to T.L.C.'s father, mother "ha[d]n't proven that she's responsible in caring for [her] children," and he expressed concern that his child, under mother's care, had had contact with C.W. He noted that he was concerned about mother's judgment because having a child around a registered sex offender is "very dangerous." *See id.* (evidence about parent's other child relevant).

Cohorn also testified that mother had had contact with C.W. during the pendency of the instant case, and mother's decision to allow him around the children was a "terrible" one. Cohorn opined that mother should not see C.W. again, he should not have contact with the children, and there should be a "no-contact order

41

regarding [C.W.]" When asked if she "ever ha[d] concerns about [mother]'s continued relationship with [C.W.] after" she had allowed him to have contact with the children in September 2016, Cohorn responded, "Yes." Further, although mother had been allowed to have visits with the children at her home, those visits had stopped after mother had allowed C.W. to have contact with her children.

A parent endangers a child by accepting the endangering conduct of other people. *See In re K.K.D.B.*, No. 14-17-00302-CV, 2017 WL 4440546, at *9 (Tex. App.—Houston [14 Dist.] Oct. 5, 2017, pet. denied) (mem. op.); *see also Jordan*, 325 S.W.3d at 721 ("[A] child is endangered when the environment creates a potential for danger which the parent is aware of but disregards."). And courts have held that a parent's decision to allow her child to have contact with a person convicted of a sexual offense constitutes endangering conduct by that parent. *In re K.K.D.B.*, 2017 WL 4440546, at *9; *see, e.g.*, *In re C.C.*, Nos. 07-15-001850-CV, 07-15-00220-CV, 2015 WL 5766513, at *4–5 (Tex. App.—Amarillo Sept. 26, 2015, no pet.) (mem. op.) (parent's lifestyle, which included dating registered sex offender and being in abusive relationships, constituted conscious course of endangering conduct); *Jordan*, 325 S.W.3d at 722, 724 (parent allowed child to have contact with other parent, whom she knew was convicted sex offender); *In re D.S.*, No. 11-09-00033-CV, 2009 WL 2470501, at *2, *5 (Tex. App.—Eastland Aug. 13, 2009, no pet.) (mem. op.) (children lived with registered sex offender); *see also*

*Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 221 (Tex. App.—El Paso 2000, no pet.) (sufficient evidence to support termination of parental rights where parent allowed child to spend time with convicted child molester).

We further note that there is evidence in the record that mother in the past had engaged in abusive behavior and been involved in abusive relationships. Mother testified that her relationship with C.W., with whom she still had contact, was abusive. And, according to mother, when she and T.L.C.'s father had lived together in the past, they "fought," mother "argued back," and he "hit [her] in front of [S.C.]" while she was pregnant. Mother also expressed current difficulty in getting along with T.L.C.'s father. Although he denied being abusive toward mother, he testified that she was abusive, verbally abusive, and negative toward him. And mother made derogatory remarks toward him in front of T.L.C. Further, during the pendency of the instant case, mother had repeatedly cursed at him and obsessively sent him text messages[38] and the trial court ordered her not to contact him directly. *See In re C.C.*, 2015 WL 5766513, at *4–5 (parent's lifestyle, which included dating registered sex offender and being in abusive relationships, constituted conscious course of

---

[38]   In her text messages, she "w[ould] become very angry[,] . . . use a lot of swearing and profanity[,] and [make] derogatory statements toward[] [T.L.C.'s father] and [his] family." *See Jordan*, 325 S.W.3d at 724 (evidence about parent's other child relevant).

43

endangering conduct); *see also Jordan*, 325 S.W.3d at 724 (evidence about parent's other child relevant).

Abusive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers a child's well-being. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). While direct physical abuse clearly endangers children, domestic violence, want of self-control, and verbal abuse may also be considered as evidence of endangerment. *In re K.R.G.*, No. 01-16-00537-CV, 2016 WL 7368082, at *9 (Tex. App.—Houston [1st Dist.] Dec. 15, 2016, pet. denied) (mem. op.); *In re J.I.T.P.*, 99 S.W.3d at 845; *see also D.N. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00658-CV, 2016 WL 1407808, at *2 (Tex. App.—Austin Apr. 8, 2016, no pet.) (mem. op.) ("[D]omestic violence may constitute endangerment, even if the violence is not directed at the child.").

There is also evidence in the record of mother's "erratic" behavior, including behavior that occurred in front of, and negatively impacted, her children. Biggers testified that during mother's visits with T.C. at the DFPS office, she had heard her, in the presence of her children, yelling at the DFPS caseworker. Because of safety concerns, security had to be called more than three times while mother was at the DFPS office. In particular, during one visit, Biggers recalled that mother had T.C. "on her hip" and was "swinging the baby around," not "supporting her [neck] like

44

she should have been," while arguing with a DFPS caseworker. Mother appeared upset and anxious, and security was called out of concern for the safety of mother's children and to protect them. Mother's visit with the children had to be stopped because of her behavior, and she was removed from the DFPS office by security. Biggers opined that mother had put T.C., who was one year old at the time, in danger "because of the way her behavior was." Biggers also noted that during another visit with the children at the DFPS office, mother "called the police on [DFPS]," was "upset in front of the children," and unable to "redirect."

Biggers explained that when mother had engaged in her "erratic" behavior at the DFPS office, T.C. was present, saw her mother's behavior, became very upset, and cried.[39] Biggers personally observed mother's erratic behavior and T.C.'s negative reaction to it on approximately ten or fifteen occasions. And she noted that it was not in the children's best interest to observe mother acting erratically.

Biggers further testified that during the pendency of the instant case, DFPS requested that mother no longer have direct contact with it because she was very argumentative, harassed DFPS employees, made "obsessive [telephone] calls," did not comply with DFPS's directives, exhibited erratic behavior during her visits with her children at the DFPS office, and "called the police on [DFPS]." Mother also sent Biggers and a DFPS caseworker threatening emails. *See In re P.M.B.*, No.

---

[39]     S.C. and T.L.C. were also upset by mother's "erratic" behavior at the DFPS office.

01-17-00621-CV, 2017 WL 6459554, at *10 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. filed) (mem. op.) (parent hostile and aggressive throughout case, including displaying hostility and cursing at DFPS caseworker); *In re J.L.M.*, No. 01-16-00445-CV, 2016 WL 6754779, at *8 (Tex. App.—Houston [1st Dist.] Nov. 15, 2016, no pet.) (mem. op.) (sufficient evidence to support endangerment finding where, during supervised visits with children, parent screamed and cursed at DFPS supervisor, which visibly upset children, and law enforcement officers called; parent also threatened and verbally abused therapist and DFPS workers); *In re E.W.*, No. 14-14-00751-CV, 2015 WL 556399, at *6 (Tex. App.—Houston [14th Dist.] Feb. 10, 2015, no pet.) (mem. op.) (considering evidence of parent's angry behavior with DFPS caseworkers, screaming arguments with her domestic partner, cursing at court hearing, and angry outburst after court proceeding, as supporting endangerment finding).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that mother engaged, or knowingly placed T.C. with persons who engaged, in conduct that endangered her physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that mother

engaged, or knowingly placed T.C. with persons who engaged, in conduct that endangered her physical and emotional well-being. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that mother engaged, or knowingly placed T.C. with persons who engaged, in conduct that endangered her physical and emotional well-being. *See id.*

We overrule this portion of mother's first issue.[40]

*Best Interest of Child*

In her third issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of T.C. because T.C. does not desire "to be permanently severed from her mother," there is sparse evidence concerning the current and future emotional and physical needs of T.C., mother does not pose a current danger to T.C., mother "successfully completed all of her FSP services," mother has a safe and suitable home, mother is employed, T.C.'s foster placement is not seeking custody,

---

[40] Having held that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(E), we need not address the remaining portion of mother's first issue or her second issue challenging the trial court's findings under Texas Family Code sections 161.001(b)(1)(D) and (O). *See In re A.V.*, 113 S.W.3d 355, 363 (Tex. 2003); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 618 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also* TEX. R. APP. P. 47.1.

and "[t]here [is] no evidence regarding what programs [are] available to promote [T.C.'s] best interest or to maintain contact with her siblings."

A strong presumption exists that a child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). However, it is also presumed that the prompt and permanent placement of a child in a safe environment is in the child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(a) (Vernon Supp. 2017); *In re D.S.*, 333 S.W.3d 379, 383 (Tex. App.—Amarillo 2011, no pet.). The best interest analysis evaluates the best interest of the child, not the parent. *See In re D.S.*, 333 S.W.3d at 384.

In determining whether the termination of mother's parental rights is in the best interest of T.C., we may consider several factors, including: (1) the child's desires; (2) the current and future physical and emotional needs of the child; (3) the current and future emotional and physical danger to the child; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the child by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. The *Holley* factors are not exhaustive, and there is no

requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27. The same evidence of acts and omissions used to establish grounds for termination under section 161.001(b)(1) may also be relevant to determining the best interest of the child. *See id.* at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of a minor child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

In regard to T.C.'s desires, she, at the time of trial, was three years old. *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (generally "[t]he young age of [a] child render[s] consideration of the child's desires neutral"); *In re M.H.*, 319 S.W.3d 137, 150 & n.9 (Tex. App.—Waco 2010, no pet.) (children ages five, seven, and nine did not possess sufficient maturity to express opinion regarding parental preference). DFPS, pursuant to "a family base safety plan," initially removed T.C. from mother's home in March 2014, when she was two months old, after mother took aspirin pills, was found unresponsive in her home by S.C., and taken to the hospital. At that time, T.C. went to live with mother's sister. Subsequently, mother "br[oke] th[at] placement" and took T.C. back to her home,

49

although she was still under a "parental-child-safety" plan. DFPS subsequently removed T.C. from mother's care in December 2014, when she was eleven months old, after mother had left her and T.L.C., who was four years old at the time, home alone. *See In re A.D.M.*, 2016 WL 7368075, at *5 (noting vulnerability of young children removed from parents' care at two years old and six months old).

Jordan, mother's therapist, who had attended two family therapy sessions with mother and the children, testified that T.C. was bonded with mother, all of the children appeared to love mother, and they knew that mother was in fact their mother. *See In re M.H.*, 319 S.W.3d at 150 (evidence children loved, enjoyed visits with, and showed affection toward parent "[was] at best marginally relevant" to children's desires). During a family therapy session that Jordan observed, mother and the children "appeared guarded, minimally communicative, and happy." And DFPS casework Biggers testified that she had observed T.C. become upset and cry whenever mother acted erratically during her visits with the children. However, mother testified that T.C. wanted to live with her and her children appeared happy to see her during their visits. *See id.*

Although "[a] child's love for her natural parent is an important consideration in the best interest determination," "[e]ven where a child is attached to a parent, . . . [a] child's desire to be returned to the parent [is] not . . . dispositive of the best interest analysis," especially "if the parent has engaged in conduct

50

dangerous to the child's well-being." *In re D.R.L.*, No. 01-15-00733-CV, 2016 WL 672664, at *5 (Tex. App.—Houston [1st Dist.] Feb. 18, 2016, no pet.) (mem. op.) (alterations in original) (internal quotations omitted); *see also In re N.T.*, 474 S.W.3d 465, 478–79 (Tex. App.—Dallas 2015, no pet.) (fact finder could reasonably form firm belief or conviction regarding termination in child's best interest, despite child's "expressed desire to live primarily with" parent); *In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *9 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.).

In regard to T.C.'s current and future physical and emotional needs, she, at the time of trial, was three years old and had a speech delay. *See In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) (emotional and physical needs of young children now and in future are great due to their age); *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *12 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.) (young children have "considerable emotional and physical needs that must be met now and in the future"); *see also In re J.N.G.*, No. 04-17-00668-CV, 2018 WL 1511831, at *3–4 (Tex. App.—San Antonio Mar. 28, 2018, no pet.) (mem. op.) (considering children's young age and vulnerabilities when determining best interest). And Jordan opined that T.C. needed a safe and stable environment.

There is evidence in the record that mother's current home, where she had lived for five years,[41] was safe, clean, and furnished, and had enough space for T.C.[42] However, mother also testified that she had not financially supported T.L.C. while she had been in the care of her father, she currently works from 10:00 p.m. to 3:00 a.m., and she did not know how much daycare would cost should T.C. be returned to her care. *See Jordan*, 325 S.W.3d at 724 (evidence about parent's other child relevant). Mother also noted that "[i]t would be really expensive" to have her children covered by health insurance, T.C. did not "have a regular schedule" when she had lived with mother in the past, and mother lacked familial support.

The record also reveals that mother left T.C., who was eleven months old at the time, and T.L.C., who was four years old, home alone at night while she went to

---

[41] Mother testified that she pays $340 a month in rent pursuant to a discount through a public housing program. However, in January 2017, the last time that she had renewed her paperwork for the housing program, she did not disclose that her children had not been living with her. Mother also did not disclose to the public housing program that her children were not living with her when she renewed her paperwork in 2015 or 2016. When asked whether "[s]tating that [her] . . . children [were] living in [her] home since 2014" was "false information," mother replied, "Yes, that would be false." *See In re S.K.*, 198 S.W.3d 899, 908 (Tex. App.—Dallas 2006, pet. denied) (considering fact parents lied about housing arrangement when determining stability of home).

[42] Mother opined that she could financially afford to care for her children, having bought them clothes and paid "[a] little bit" for their medications while they were in DFPS's custody. Mother also testified that, when the children were in her care, she took them to the doctor and they were current on their immunizations

52

a store. When mother returned home, T.L.C. was "at the door."[43] Mother instructed T.L.C. not to "tell anyone that she [had] left [the home]" and confided in C.W. that she "need[ed] to figure out how to tell [T.L.C.] how not to tell anyone about what [went] on in [her] home."[44] *See id.* (evidence about parent's other child relevant).

DFPS investigator Perkins opined that by leaving T.C. and T.L.C. home alone, mother "creat[ed] an immediate danger to the[ir] safety and welfare," "demonstrate[d] [her] inability to be protective of [her] children," and "exhibit[ed] questionable judgment through her actions." *See In re M.C.*, 917 S.W.2d at 269–70 (parent's failure to protect or supervise her young child endangers child's physical or emotional well-being); *In re A.D.N.*, No. 01-16-00785-CV, 2017 WL 491286, at *2, *9 (Tex. App.—Houston [1st Dist.] Feb. 7, 2017, pet. denied) (mem. op.) (considering parent's decision, which resulted in four-year-old child and

---

[43] Mother's FSP stated that she had *continually* left her two young children, T.C. and T.L.C., "who [were] both very vulnerable," unsupervised and alone in her home. While the children were alone, T.L.C. "left the home, and was seen wandering around the apartment complex looking for her mother." Further, mother "ha[d] failed to accept responsibility of being a parent to her children" and "lack[ed] the ability to apply how to be a better parent." Mother had limited familial support and "ha[d] not demonstrated an ability to use her support systems to help ensure that [her] children [were] safe at all times."

[44] Mother testified that she went to a store because she needed medicine for T.L.C. And it had taken her two days to get enough money to purchase medicine for T.L.C. *See generally In re A.C.D.*, No. 05-16-00779-CV, 2016 WL 6835725, at *10 (Tex. App.—Dallas Nov. 3, 2016, no pet.) (mem. op.) (considering parent's medication decisions related to child in determining best interest); *see also Jordan*, 325 S.W.3d at 724 (evidence about parent's other child relevant).

nine-month-old child being left alone, in determining physical and emotional needs and danger now and in future); *In re A.D.M.*, 2016 WL 7368075, at *8 (parent endangered one-year-old child by leaving her home alone); *In re J.W.H.*, No. 09-03-401CV, 2004 WL 584611, at *2–3 (Tex. App.—Beaumont Mar. 25, 2004, no pet.) (mem. op.) (leaving child home alone not in best interest of child); *see also In re J.N.G.*, 2018 WL 1511831, at *4 (parent's past behavior showed poor judgment regarding his children).

Further, the record reveals evidence that mother had engaged in abusive relationships in the past and, per mother's testimony, there had been domestic violence in her home. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (11), (12)(D), (12)(E) (considering history of abusive or assaultive conduct by child's family, willingness and ability of child's family to effect positive environmental and personal changes, ability to provide safe physical home environment, and ability to protect child from repeated exposure to violence); *Nelson v. Nelson*, 01-13-00816-CV, 2015 WL 1122918, at *4 (Tex. App.—Houston [1st Dist.] Mar. 12, 2015, pet. denied) (mem. op.) (trial court appropriately considered parent's ability to provide safe, stable, and nonviolent environment for children in determining best interest).

Mother engaged in a relationship with C.W., a registered sex offender, before DFPS's involvement with the children in the instant case and after it had removed

54

T.C. from her care. *See In re O.R.W.*, No. 09-15-00079-CV, 2015 WL 4760159, at *4 (Tex. App.—Beaumont Aug. 13, 2015, no pet.) (mem. op.) (parent's decision to expose child to "accused sex offender indicated an inability to meet [child's] emotional and physical needs and to protect her from certain dangers"). According to mother, she began dating C.W. in 2012, became aware that he was a registered sex offender in July 2013, while she was pregnant with T.C., and continued her relationship with him until 2015. C.W. had been to mother's home and had previously spent the night there, although it had been "[a] long time" since that had occurred. She last saw C.W. on September 24, 2016; however, while the instant case was pending, she had contact with him through text messages and the telephone.[45] And mother noted that she had emailed C.W. in January 2017, a month before trial began. Mother also testified that she did not want C.W.'s parental rights to be terminated.

Moreover, on September 24, 2016, while this case was pending, mother told C.W. that she and the children, including T.C., were going to a Chuck E. Cheese restaurant during one of mother's unsupervised visits with the children. Although she did not invite him, C.W. came to the restaurant for thirty minutes, and during

---

[45]     Mother explained that she had seen C.W. "[a]t the most, five [times]" since September 24, 2016, either at the library or on her way to the bus. However, she did not discuss anything with C.W. during those times. And she had not had direct contact with C.W. since September 24, 2016, although she had "seen him from time to time sometimes, not all the time."

55

that time, he held T.C. and hugged her once. C.W. also came to mother's home that day, while the children were there for their unsupervised visit. Mother let him into her home and did not "force him to leave." He stayed at mother's home for about thirty minutes, and during that time, C.W. tickled T.L.C. and chased the children around in a circle "for play." Mother conceded that she had exercised poor judgment in allowing C.W. to have contact with the children and it was not in their best interest.[46] *See In re J.M.*, No. 01-14-00826-CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.) ("[A] parent's exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care for the child."); *see also In re J.N.G.*, 2018 WL 1511831, at *4 (parent's past behavior showed poor judgment regarding his children).

Almost every witness at trial expressed concern about mother's involvement with C.W. because "he's a registered sex offender who's highly likely to offend again."[47] Jordan opined that mother's decision to bring T.C. and her other two

---

[46] Mother also testified that C.W. had stolen her "EBT food stamp card" from her home.

[47] The trial court admitted into evidence C.W.'s criminal record, revealing that on December 1, 2005, he was convicted of the felony offense of sexual performance by a child and sentenced to confinement for three years. *See* TEX. PENAL CODE ANN. § 43.25(d), (e). In that case, the indictment alleged that C.W., "did then and there unlawfully, and knowing the character and content of the material, intentionally and knowingly direct[] a performance including sexual conduct by a child younger than eighteen years of age, namely photographing the child[']s female sexual organ area." *See id.* § 43.25(d).

children into contact with C.W. placed them in danger. And both Biggers and Jordan testified that they had discussed with mother, prior to September 2016, the fact that C.W. was a registered sex offender and advised her against having her children around him.

A parent who lacks the ability to provide a child with a safe and stable home is unable to provide for a child's emotional and physical needs. *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14 Dist.] 2014, no pet.); *see also* TEX. FAM. CODE ANN. § 263.307(a), (b)(12)(D) (child's need for prompt and permanent placement in safe environment paramount and considering ability to provide safe physical home environment for child); *In re B.J.*, No. 01-15-00886-CV, 2016 WL 1389054, at *10–11 (Tex. App.–Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) (parent, who did not demonstrate she could provide safe and stable home, unable to meet children's needs); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.) (child's need for stable, permanent home paramount consideration in best interest determination); *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (parent's history of failing to provide children with "stable and nurturing environment" demonstrates termination of parental rights in best interest of children).

In regard to the current and future emotional and physical danger to T.C., the record reflects that on March 9, 2014, DFPS received a report of neglectful

supervision of T.C. and mother's other two children, S.C. and T.L.C. S.C., who was eleven years old at the time, had found mother "unresponsive on the floor next to her bed." Also, found next to the bathroom sink, was an aspirin bottle with forty-nine pills missing. S.C. called for emergency assistance, and mother was taken to a hospital. Mother told DFPS that "she was not trying to commit suicide," but she had taken "10-15 pills due to feeling really upset." She had been feeling upset "for some time," "got real depressed," and an argument with C.W. "triggered her." Because mother was "unable to provide adequate care for" the children, T.C. and her sister, T.L.C., were placed with mother's sister to "ensure [their] safety."

Cohorn also testified that mother had reported having taken an overdose of pills to mental health professionals, and the overdose was the reason that DFPS had become involved in the instant case.

Mother testified that she had taken three or four aspirin pills while her children were in her home, called for emergency assistance, and went to a hospital.[48] She was "really sad because [her] grandmother had died," she had been "having a lot of bad headaches from" giving birth to T.C., and she had "split [her] stitches." She was in pain, was on "bedrest," and felt overwhelmed and depressed. And she did not have any help. Mother explained that she had not "tr[ied] to kill" herself, but at the hospital, she did go "to see somebody" in psychiatric services because she had taken

---

[48] Mother also testified that her mother had called for emergency assistance, not her.

the pills. She also did go to the MHMRA of Harris County after the "pill incident."

*See In re J.M.*, 2015 WL 1020316, at *7; *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) ("Evidence of past misconduct or neglect can be used to measure a parent's future conduct."); *see also J.S. v. Tex. Dep't Family & Protective Servs.*, 511 S.W.3d 145, 162 (Tex. App.—El Paso 2014, no pet.) (parent's suicide attempts presented "clear emotional danger" to children); *In re N.B.*, 2012 WL 1605457, at *12 (sufficient evidence to support best-interest finding where parent "discussed suicide" and "appeared to be in emotional danger"); *In re E.A.W.S.*, 2006 WL 3525367, at *13 (overdosing, even unintentionally, creates emotional and physical danger to child now and in future).

Mother's FSP also noted that she had been diagnosed with "[m]ental health issues," and DFPS caseworker Biggers expressed concerns about mother's mental health status. Moreover, Jordan, mother's therapist, addressed mother's mental health status in her final "Progress Note," stating:

> Anxiety symptoms are present. [Mother]'s anxiety symptoms continue. The symptoms of this disorder continue unchanged. Anxiety attacks are reported to be occurring a few times a week. [Mother] continues to avoid certain situations because they still evoke anxiety. The frequency of irritability episodes remains the same.
>
> [Mother] exhibits symptoms of borderline personality disorder, characterized by pervasive instability in moods, behavior, and interpersonal relationships. She reports [that] her interpersonal relationships are unstable and intense.

59

[Mother] exhibits symptoms of dependent personality disorder, characterized by a long standing need to be taken care of and a fear of being abandoned or separated from important individuals in her life. She avoids making decisions and allows others to make her important decisions. [Mother] fears losing [her] family. [She] describes [an] intense fear of abandonment and a sense of devastation or helplessness when relationships end.

Mother did not express any suicidal ideas or intentions during her final session, in September 2016, with Jordan. However, she appeared angry, sad, guarded, minimally communicative, anxious, and downcast. And Jordan opined that mother's insight into her problems and her judgment appeared poor. Jordan diagnosed mother with a generalized anxiety disorder and a "[l]ack of insight into the consequences of [her] behavior." Jordan recommended that mother continue individual and family therapy after her therapy sessions with Jordan ceased; however, mother did not follow through with Jordan's recommendation. *See In re S.A.G.*, No. 2-09-125-CV, 2010 WL 1006301, at *9 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op.) (parent's thoughts of suicide, depression, and memory problems hindered her ability to care for children's needs and posed emotional and physical danger to children now and in future); *In re J.I.T.P.*, 99 S.W.3d at 845 ("[T]he trial court could have considered [parent's] mental state as endangering [the child's] well-being."); *In re C.D.*, 664 S.W.2d at 853 ("While mental incompetence or mental illness alone are not grounds for termination of the parent-child relationship, when a parent's mental state allows h[er] to engage in conduct which

60

endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights.").

Further, as previously noted, mother had left T.C., who was eleven months old at the time, and T.L.C., who was four years old, home alone at night while she went to a store. And when mother returned home, T.L.C. was "at the door."[49] *See In re M.C.*, 917 S.W.2d at 269–70 (parent's failure to protect or supervise her young child endangered child's physical or emotional well-being); *In re A.D.N.*, 2017 WL 491286, at *2, *9 (considering parent's decision, which resulted in four-year-old child and nine-month-old child being left alone, in determining physical and emotional needs and danger now and in future); *In re A.D.M.*, 2016 WL 7368075, at *8 (parent endangered one-year-old child by leaving her home alone); *A.R.*, 2016 WL 5874874, at *3–5 ("Leaving a[] [child] alone can constitute endangerment . . . ."); *In re J.W.H.*, 2004 WL 584611, at *2–3 (leaving child home alone not in best interest of child); *see also In re J.N.G.*, 2018 WL 1511831, at *4 (parent's past behavior showed poor judgment regarding his children).

Mother had also engaged in abusive relationships in the past and, per mother's testimony, there had been domestic violence in her home. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (11), (12)(D), (12)(E) (considering history of abusive or assaultive

---

[49] Mother's FSP also stated that she had *continually* left T.C. and T.L.C. unsupervised and alone in her home. While the children were alone, T.L.C. "left the home, and was seen wandering around the apartment complex looking for her mother."

conduct by child's family, willingness and ability of child's family to effect positive environmental and personal changes, ability to provide safe physical home environment, and ability to protect child from repeated exposure to violence); *In re J.S.-A.*, No. 01-17-00491-CV, 2018 WL 891236, at *8 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, pet. denied) (mem. op.) ("Evidence of domestic violence . . . supports a finding that placement with parent is likely to subject the child to emotional and physical danger now and in the future."); *Nelson*, 2015 WL 1122918, at *4 (trial court appropriately considered parent's ability to provide safe, stable, and nonviolent environment for children in determining best interest); *In re J.I.T.P.*, 99 S.W.3d at 846 (exposure to domestic violence, even when child not intended victim, supports finding termination in child's best interest).

Moreover, before DFPS's involvement in the instant case, and during its pendency, mother engaged in a relationship with C.W., a registered sex offender, and brought her children, including T.C., in contact with him, after mother had been advised to not do so. *See In re K.K.D.B.*, 2017 WL 4440546, at *9 (parent endangers a child by accepting endangering conduct of other people, and decision to allow child to have contact with person convicted of sexual offense constitutes endangering conduct); *In re O.R.W.*, 2015 WL 4760159, at *4 (parent's decision to expose child to "accused sex offender indicated an inability to meet [child's] emotional and physical needs and to protect her from certain dangers"); *see also In re A.T.*, No.

02-17-00230-CV, 2017 WL 4819414, at *8 (Tex. App.—Fort Worth Oct. 26, 2017, no pet.) (mem. op.) (parent's relationship with registered sex offender constituted "emotional and physical danger to [child] now and in the future"); *In re C.C.*, 2015 WL 5766513, at *4–5 (parent's lifestyle, which included dating registered sex offender and being in abusive relationships, constituted conscious course of endangering conduct). Mother conceded that she had exercised poor judgment in allowing C.W. to have contact with her children and it was not in their best interest to have done so.[50] *See In re J.M.*, 2015 WL 1020316, at *7 ("[A] parent's exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care for the child."); *see also In re J.N.G.*, 2018 WL 1511831, at *4 (parent's past behavior showed poor judgment regarding his children).

In regard to mother's parental abilities, Jordan testified that on September 26, 2016, she attended a family therapy session at mother's home. During the session, mother was cooperative, and Jordan worked with her on "a discipline chart, behavior modification, [and] how to deal with disciplining" her children. She also continued to work with mother on her issues related to anxiety, depression, anger management, parenting, and boundaries. According to Jordan, mother, T.C., and the other two

---

[50] Mother also testified that C.W. had stolen her "EBT food stamp card" from her home.

63

children appeared to interact as a family, the children appeared to love their mother, and they knew that mother was their mother.

In regard to her children, mother testified that to discipline them, she would put them in a "timeout in the corner" or spank them, and she had never left any marks or bruises on them. While in her care, mother took the children to the museum, the park, and on walks outside. Mother also took the children to the doctor, and they were current with their immunizations.

Cohorn testified that, during the pendency of the instant case, she observed mother with her children, including T.C., approximately fifteen to twenty times. Mother appeared to have a good and normal relationship with her children and appropriately played with T.C. and T.L.C. She always brought something for the children to play with at their visits, such as "marbles or coloring [tools] or dolls." And Cohorn did not observe anything during mother's visits with the children that caused her any concern.

However, as noted above, there is also evidence in the record that mother overdosed on aspirin pills while the children were in her home, she was "unable to provide adequate care for" the children, and she left her two young children home alone while she went to a store. Mother also instructed T.L.C. not to "tell anyone that she [had] left [the home]" and confided in C.W. that she "need[ed] to figure out how to tell [T.L.C.] how not to tell anyone about what [went] on in [her] home." *See*

*In re A.R.M.*, No. 05-17-00539-CV, 2018 WL 1559820, at *11 (Tex. App.—Dallas Mar. 30, 2018, no pet.) (mem. op.) (in determining best interest, noting parent coached child to lie); *In re A.R.M.*, No. 04-15-00314-CV, 2015 WL 6735284, at *5 (Tex. App.—San Antonio Nov. 4, 2015, no pet.) (mem. op.) (evidence sufficient to support best-interest finding where parent instructed children to lie to caseworkers).

Further, mother allowed her children, including T.C., during the pendency of this case, to be in contact with C.W., a registered sex offender. Jordan opined that mother's decision to allow her children around a registered sex offender weighed against her parental abilities, especially because mother was aware at the time that she was not allowed to have the children around him. And Perkins opined that by leaving the children home alone, mother "creat[ed] an immediate danger to the[ir] safety and welfare," "demonstrate[d] [her] inability to be protective of [her] children," and "exhibit[ed] questionable judgment through her actions." And mother's FSP noted that she had limited familial support and "ha[d] not demonstrated an ability to use her support systems to help ensure that [her] children [were] safe at all times."

The record also reveals that mother had repeatedly acted erratically in front of her children, including T.C., during the pendency of the instant case. Biggers testified that, during mother's visits with T.C. at the DFPS office, she had heard her, in the presence of the children, yelling at the DFPS caseworker, and mother appeared

65

anxious and very upset. Because of safety concerns, security had to be called more than three times while mother was at the DFPS office.

In particular, during one visit, Biggers recalled that mother had T.C. "on her hip" and was "swinging the baby around," not "supporting her [neck] like she should have been," while arguing with a DFPS caseworker. Security was then called out of concern for the safety of mother's children and to protect them. Mother's visit with the children had to be stopped because of her behavior, and she was removed from the DFPS office by security. Biggers opined that it was not in the children's best interest to observe "their mother being removed by a security officer from their visit." Biggers also noted that during another visit with the children, mother "called the police on [DFPS]," was "upset in front of the children," and was unable to "redirect." *See In re P.M.B.*, 2017 WL 6459554, at *13 (parent's aggressive and hostile behavior throughout case supported best-interest finding); *In re J.L.M.*, 2016 WL 6754779, at *10 (in determining parental ability, considering evidence parent, during supervised visits with children, screamed and cursed at DFPS supervisor, which visibly upset children, and law enforcement officers called; parent also threatened and verbally abused therapist and DFPS workers).

Biggers explained that when mother had engaged in her "erratic" behavior at the DFPS office, T.C. was present, saw her mother's behavior, became very upset, and cried. Biggers personally observed mother's erratic behavior and T.C.'s

66

negative reaction to it on approximately ten or fifteen occasions. And it was not in the children's best interest to observe their mother acting erratically.[51] *See In re N.G.G.*, No. 05-16-01084-CV, 2017 WL 655953, at *7 (Tex. App.—Dallas Feb. 17, 2017, pet. denied) (mem. op.) (parent's erratic behavior reflected poor parental abilities); *In re A.T.*, No. 04-15-00121-CV, 2015 WL 4638240, at *4 (Tex. App.— San Antonio Aug. 5, 2015, pet. denied) (mem. op.) (considering parent's erratic behavior and harassing and threatening conduct in determining best interest).

Mother testified that after her individual and family therapy sessions with Jordan ceased in September 2016, she saw only one other therapist, Scott, approximately five times for individual therapy. She had last attended a therapy session with Scott about four months before trial because she could no longer afford to pay him. Mother conceded that she did not receive a "successful completion of therapy certificate from . . . Scott," and she did not see another family therapist after

---

[51] Biggers further testified that during the pendency of the instant case, DFPS requested that mother no longer have direct contact with it because she was very argumentative, harassed DFPS employees, made "obsessive [telephone] calls," did not comply with DFPS's directives, exhibited erratic behavior during her visits with her children at the DFPS office, and "called the police on [DFPS]." Mother also sent Biggers and a DFPS caseworker threatening emails. *See In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *13 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. filed) (mem. op.) (parent's aggressive and hostile behavior throughout case supported best-interest finding); *In re J.L.M.*, No. 01-16-00445-CV, 2016 WL 6754779, at *10 (Tex. App.—Houston [1st Dist.] Nov. 15, 2016, no pet.) (mem. op.) (in determining parental ability considering evidence parent, during supervised visits with children, screamed and cursed at DFPS supervisor, which visibly upset children, and law enforcement officers called; parent also threatened and verbally abused therapist and DFPS workers).

Jordan had terminated her family therapy sessions with mother. Further, although she had worked with Jordan on anger management issues, she did not seek another therapist to continue to address any anger management concerns after her therapy sessions with Jordan ceased.

In regard to the programs available to assist mother, the record reveals that although DFPS had many programs available to assist her, mother did not complete her FSP, particularly her individual and family therapy requirements, and she failed to seek out additional therapists after Jordan had terminated her sessions with mother. *See In re J.-M.A.Y.*, Nos. 01-15-00469-CV, 01-15-00589-CV, 2015 WL 6755595, at *7 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, pet. denied) (mem. op.); *see also* TEX. FAM. CODE ANN. § 263.307(b)(11) (considering parent's willingness and ability to effect environmental and personal changes within reasonable period of time); *In re Z.B.*, No. 02-14-00175-CV, 2014 WL 5409103, at *9 (Tex. App.—Fort Worth Oct. 23, 2014, no pet.) (mem. op.) (parent did not take advantage of DFPS services offered to her); *Gammill v. Tex. Dep't of Family & Protective Servs.*, No. 03-08-00140-CV, 2009 WL 1423975, at *8 (Tex. App.—Austin May 22, 2009, pet. denied) (mem. op.) (parent's sporadic therapy attendance cast doubt on whether she would meaningfully avail herself of programs available to assist her). A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her child that she does not

68

have the ability to motivate herself to seek out available resources needed now or in the future. *See In re A.L.W.*, No. 01-14-00805-CV, 2015 WL 4262754, at \*12 (Tex. App.—Houston [1st Dist.] July 14, 2015) (mem. op.); *In re J.M.*, 2015 WL 1020316, at \*7; *see also* TEX. FAM. CODE ANN. § 263.307(b)(11).

In regard to the stability of the proposed placement and the plans for T.C., Biggers testified that at the time of trial T.C. was in a non-relative foster placement, and DFPS's goal for her was an unrelated adoption. Although T.C. had been previously placed with one of mother's relatives, she was subsequently removed from the placement, not at the request of DFPS, but because mother was uncooperative. Notably, since T.C. was removed from mother's care, mother has engaged in behavior that has been continuously disruptive to T.C.'s placements.[52] Jordan opined that mother's children, including T.C., needed a safe and stable environment. *See* TEX. FAM. CODE ANN. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Stability and permanence are paramount in the upbringing of

---

[52] Mother testified that she "br[oke] the placement" when T.C. was living with mother's sister. And when T.C. was placed with mother's cousin, mother "told her . . . [that she] didn't want her with [T.C.]," causing the cousin to return T.C. to DFPS's custody. Mother further admitted to calling law enforcement officers to T.C.'s foster placement.

69

children."); *In re K.C.*, 219 S.W.3d at 931 (child's need for stable, permanent home paramount consideration in best interest determination).

Although T.C.'s current placement is not a permanent or long-term placement, Biggers testified that during the pendency of the instant case, DFPS requested that T.C. be moved to a more permanent placement; a request that the trial court denied because of the nearness to trial. Biggers, however, opined that the potential permanent placement for T.C., which was with her doctor, was still an option for her at the time of trial. And the fact that T.C. is not currently in a long-term or permanent placement is not a dispositive fact. *See In re C.H.*, 89 S.W.3d at 28.

Further, in regard to the potential placement of T.C. back into mother's home, we note that there is evidence in the record that her current home, where she had lived for five years, was safe, clean, and furnished, and had enough space for T.C.[53] However, the record also reveals that mother provided false information to the public housing program through which she receives a discount on her rent; left T.C., who was eleven months old at the time, and T.L.C., who was four years old, alone in her

---

[53] Mother opined that she could financially afford to care for her children, having bought them clothes and paid "[a] little bit" for their medication while they were in DFPS's custody. Mother also took the children to the doctor when they were in her care, and they were current on their immunizations. *See In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("The trial court may . . . discount[] the [parent's] testimony about her plans for the [c]hild and determined they were unrealistic . . . ."); *In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied) (fact finder "was free to reject [parent's] assertions of future stability").

home at night while she went to a store; engaged in an abusive relationship in the past; allowed domestic violence to occur in her home; and before DFPS's involvement, and during the pendency of this case, engaged in a relationship with C.W., a registered sex offender who had previously stayed at mother's home and had been there while T.C. was present. Perkins opined that mother, in the past, had "creat[ed] an immediate danger to [her children's] safety and welfare," "demonstrate[d] [her] inability to be protective of [her] children," and "exhibit[ed] questionable judgment through her actions." *See* TEX. FAM. CODE ANN. § 263.307(a), (b)(7), (11), (12)(D), (12)(E) (child's need for prompt and permanent placement in safe environment paramount and considering history of abusive or assaultive conduct by child's family, willingness and ability of child's family to effect positive environmental and personal changes, ability to provide safe physical home environment, and ability to protect child from repeated exposure to violence); *In re B.J.*, 2016 WL 1389054, at *10–14 (parent did not demonstrate she could provide safe and stable home); *In re K.C.*, 219 S.W.3d at 931 (child's need for stable, permanent home paramount consideration in best interest determination); *Adams*, 236 S.W.3d at 280 (parent's history of failing to provide children with "stable and nurturing environment" demonstrates termination of parental rights in best interest of children); *see also In re A.T.*, 2017 WL 4819414, at *8 (parent in relationship with registered sex offender unable to provide stable home); *In re S.K.*, 198 S.W.3d 899,

71

908 (Tex. App.—Dallas 2006, pet. denied) (considering fact parents had lied about housing arrangement when determining stability of home).

Further, mother testified that she currently works from 10:00 p.m. to 3:00 a.m., she did not know how much daycare would cost for T.C. should she be returned to her care, and "[it] would be really expensive" to have her children covered by health insurance. Mother also lacked familial support, and on at least one occasion, she had to wait two days to buy T.L.C. medicine because she "didn't have the money." *See In re J.D.*, 436 S.W.3d a 119–20 (considering parent's lack of support system, inability to provide adequate care for children, lack of income, and poor judgment).

In regard to acts or omissions that may indicate that the parent-child relationship is not proper, a parent's inability to provide a stable home and failure to comply with her FSP support a finding that termination of her parental rights is in the best interest of the child. *In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.). As discussed above, there is ample evidence that mother is unable to provide a safe and stable home for T.C. and failed to comply with the terms of her FSP.[54] *See In re B.J.*, 2016 WL 1389054, at *13.

---

[54] We also consider the following relevant to this factor: mother's overdose on aspirin pills while her children were in her home; her decision to leave T.C. and T.L.C. home alone while she went to a store; her relationship with C.W., a registered sex

72

To the extent that mother, in her brief, relies on certain positive evidence in the record related to her to argue that the *Holley* factors weigh against the trial court's best-interest finding, we note that while there may be some evidence in the record in her favor, such evidence cannot be read in isolation; it must be read in the context of the entire record. *See In re P.M.B.*, 2017 WL 6459554, at *15; *In re K.C.F.*, No, 01-13-01078-CV, 2014 WL 2538624, at *16 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.). Here, the balance of the record evidence reveals that mother is unable to meet the current and future physical and emotional needs of T.C.; is unable to protect T.C. from current and future emotional and physical danger; lacks parental abilities; has engaged in erratic and dangerous behavior before DFPS became involved in, and during the pendency of, the instant case; has not availed herself of programs available to assist her; and is unable to provide T.C. with a safe and stable home environment.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of mother's parental rights is in the best interest of T.C. *See* TEX. FAM.

offender with whom she remained in contact during the pendency of the instant case; and her decision to bring her children in contact with C.W., knowing that he was a registered sex offender and despite the fact that she had been advised against doing so. *See In re A.T.*, No. 02-17-00230-CV, 2017 WL 4819414, at *8 (Tex. App.— Fort Worth Oct. 26, 2017, no pet.) (mem. op.) (parent's relationship with registered sex offender indicates "existing parent-child relationship between [parent] and [child] is not a proper" one).

CODE ANN. § 161.001(b)(2). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's parental rights is in the best interest of T.C. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's parental rights is in T.C.'s best interest or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of T.C.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of mother's parental rights is in the best interest of T.C. *Id.*

We overrule mother's third issue.[55]

---

[55] In her fourth issue, mother contends that the trial court erred in appointing DFPS, and not her, as T.C.'s permanent managing conservator; however, mother asks the Court to address this issue only *if* we reverse the trial court's "termination finding." Because of our disposition of mother's other issues, we need not address mother's permanent-managing-conservator complaint. *See* TEX. R. APP. P. 47.1; *see also In re L.G.R.*, 498 S.W.3d 195, 206–07 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (where evidence supporting termination sufficient, no error in appointing DFPS as sole managing conservator); *In re S.R.*, 452 S.W.3d 351, 359 n.3 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("A trial court does not abuse its discretion in appointing [DFPS] as conservator of the children where the evidence is sufficient to support termination of parental rights.").

**Conclusion**

We affirm the judgment of the trial court.

                                        Terry Jennings
                                        Justice

Panel consists of Justices Jennings, Keyes, and Higley.